WILLIAM P. MAULSBY *vs.* CHARLES T. REIFSNIDER.

*Defamatory words—Privilege of Counsel—Words spoken by Counsel in the Trial of a Cause—Action for Slander— Reference to the Subject-matter of Inquiry.*

Words spoken by counsel in a judicial proceeding, if made with reference to the subject-matter of inquiry, are not actionable, although they may be false and malicious.

Where in an action by an attorney to recover money alleged to be due him for professional services, the defendant's attorney charges that the plaintiff as attorney for the defendant "had collected for her five thousand dollars of her money, and refused to pay it over to her," such words have reference to the subject-matter of inquiry before the Court, and whether true or false, whether spoken maliciously or in good faith, will not sustain an action for slander.

The privilege of counsel in the trial of a cause is not absolute and unqualified and slanderous words spoken by him, having no relation or reference to the cause on trial, or to any subject-matter involved therein, are actionable.

The privilege of counsel exempting him from actions of slander for defamatory words used by him in his professional capacity in the trial of a cause, is absolute and unqualified.  *Per* McSHERRY, J.

APPEAL from the Circuit Court for Washington County.

This action was instituted by the appellant in the Circuit Court for Carroll County, and thence removed to the Circuit Court for Washington County, where it was tried. The case is stated in the opinion of this Court.

The cause was argued before ROBINSON, STONE, IRVING, BRYAN, and McSHERRY, J.

*William J. Witzenbacher,* and *Hy. Kyd Douglas,* for the appellant.

Recognizing the policy and wisdom of allowing all attorneys and solicitors the most ample liberty to say

and do all things which may be needful to help the causes of their clients, and that may be called for by the legitimate exigencies of such causes, it is insisted that there are bounds beyond which, in law and reason, they must not go, and outside of which there is no unqualified privilege. Within these bounds is all the freedom we require for ourselves or our clients, consistent with dignity and decency; beyond is only that license, which easily abused, will often lead to scandal and violence, degrade the profession and bring contempt upon the administration of justice.

The important question thus made is presented squarely to this Court for adjudication, with whatever aid they may desire from numerous cases in this country and in England.

As early as James I., it was said: "A counsellor hath a privilege to enforce anything which is informed unto him by his client and to give it in evidence, *it being pertinent to the matter in question,* and not to examine whether it be true or false." *Brook vs. Montague, Cro. Jac.,* 30.

Blackstone also says: "A counsellor is not answerable for any matter by him spoken relative to the cause in hand and suggested by his client's instructions, although it should reflect upon the reputation of another, and even prove absolutely groundless; but if he mention an untruth of his own invention or even upon instructions, *if it be impertinent to the cause in hand, he is then liable to an action from the party injured.*" 3 *Black.,* 29. See also 2 *Broom & Hadley's Com.,* 29; *Folkard's Starkie on Slander,* (4 *Eng. Ed.,*) sec. 362; *Hodgson vs. Scarlett,* 1 *Barn. & Ald.,* 223, 1 *Holt, N. P.,* 621; *Dawkins vs. Rokeby, L. R.,* 7 *Eng. & Ir. App.,* 744; *Maurice vs. Worden,* 54 *Md.,* 233; *Seaman vs. Netherclift, L. R.,* 2 *C. P. Div.,* 53; *Dawkins vs. Lord Paulet, L. R.,* 5 *Q. B.,* 94; *Gray vs. Pentland,* 2 *Serg. & R.,* 30; *McMillan*

Maulsby *vs.* Reifsnider.

*vs. Birch,* 1 *Binney,* 178; *Keane vs. McLaughlin,* 2 *Serg. & R.,* 471; *Hoar vs. Wood,* 3 *Metc.,* 193; *Cooley on Const. Lim.,* (*Ed.* 1871,) 443; *Townshend on Slander & Libel,* (3d *Ed.*), 392; 2 *Bouvier's Institutes, p.* 513, sec. 2257, (*Ed.* 1851); 1 *Hilliard on Torts, p.* 344, sec. 118, (*Ed.* 1859); *Odgers on Libel and Slander* (1st *Amer. Ed.*), 190; *Notes to Howard vs. Thompson,* 1 *American Leading Cases, side page* 173; 2 *Addison on Torts,* (*Wood's Edition*), *p.* 358, sec. 1133; 5 *Waite's Act. & Def.,* 754, 757; *Poe's Pleading,* sec. 190; *Rice vs. Coolridge,* 121 *Mass.,* 395; *Shelfer vs. Gooding,* 2 *Jones Law,* (*N. C.*), 175; *Barnes vs. McCrate,* 32 *Maine,* 442; *Jennings vs. Paine,* 4 *Wisconsin,* 358; *Lea vs. White,* 4 *Sneed* (*Tenn.*), 111; *Ruohs vs. Backer,* 6 *Heisk.,* 393; *Hastings vs. Lusk,* 22 *Wend.,* 410; *Ring vs. Wheeler,* 7 *Cowen,* 725; *Marsh vs. Ellsworth,* 50 *N. Y.,* 390; *Garr vs. Selden,* 4 *N. Y.,* 94; *White vs. Carroll,* 42 *N. Y.,* 161; *Smith vs. Howard,* 28 *Iowa,* 51; *Stackpole vs. Hennen,* 6 *Martin,* (*La.*) *N. S.,* 481; *McLaughlin vs. Cowley,* 127 *Mass.,* 319, *affirmed in* 131 *Mass.,* 70; *Burlingame vs. Burlingame,* 8 *Cowen,* 141; *Lathrop vs. Hyde,* 25 *Wend.,* 448; *Gilbert vs. The People,* 1 *Denio,* 42; *Warner vs. Paine,* 2 *Sandf. S. Ct.,* 195; *Eccles vs. Shannon,* 4 *Harr.* (*Del.*), 193; *Davis vs. McNees,* 8 *Hump.,* 40; *Mower vs. Watson,* 11 *Ver.,* 536; *Badgley vs. Hedges, Penn.* (*N. J.*), 233; *Hardin vs. Comstock,* 2 *A. K. Mar.,* (*Ky.*), 480; *Forbes vs. Johnson,* 11 *B. Mon.,* 51; *Morgan vs. Booth,* 13 *Bush,* 482; *Wyatt vs. Buell,* 47 *Cal.,* 624; *Johnson vs. Brown,* 13 *W. Va.,* 71; *Lawson vs. Hicks,* 38 *Ala.,* 279; *Suydam vs. Moffatt,* 1 *Sandf. S. Ct.,* 459; *Lanning vs. Christy,* 30 *Ohio,* 115; *Lester vs. Thurmond,* 51 *Ga.,* 118; *Whitney vs. Allen,* 62 *Ill.,* 472; *Perkins vs. Mitchell,* 31 *Barb.,* 468; *White vs. Nichols,* 3 *Howard,* 287.

The unanimity and concurrence of the decisions put argument out of the question. If anything is settled

in the American Courts, the limits of an advocate's privilege is that thing.

This rule, then, is the result of all the authorities:—

Counsel are absolutely privileged for words spoken in the course of judicial proceedings, provided the words so uttered are pertinent, material, and relevant to the issues in said proceedings involved.

This is the rule that has been disavowed in the Court below, and it is the disregard of this.rule that prompts this appeal.

*William P. Maulsby,* filed a brief in his own behalf.

*J. Clarence Lane,* and *Henry H. Keedy,* for the appellee.

It is contended by the appellant that the privilege of counsel is only qualified, whilst the contention of the appellee is that it is absolute; that in the language of Lord MANSFIELD, in *Rex vs. Skinner, Lofft,* 55—"Neither party, witness, counsel, jury nor Judge can be put to answer civilly or criminally for words spoken in office." And that the occasion gives the immunity on the ground that it is "advantageous for the public interest that such persons should not in any way be fettered in their statements."

The ruling of the Court below with a full bench, upon the demurrer upon the admissibility of the testimony and upon the prayer, proceeded upon the ground of absolute privilege, and whether the alleged slanderous words were spoken falsely and maliciously, whether they were material and pertinent, and whether they were spoken without probable cause and with express malice, still having been spoken by an attorney at law in the course of the trial of a case before a Court of justice, and in reference thereto, the occasion affords an absolute immunity, and the law clothes the attorney

"with a privilege in respect of liberty of speech which is in practice bounded only by his own sense of duty."

The statement of the case shows its importance, and the far-reaching and disastrous consequences if such actions could be maintained. It would strike at the very foundation of the administration of law and justice and manacle the officers of the Court.

As to the absolute privilege of Judges, see *Yates vs. Lansing*, 5 *Johns.*, 291; *Hammond vs. Howell*, 1 *Mod.*, 184.

In the case of *Bradley vs. Fisher*, 13 *Wall.*, 335, Judge FIELD, speaking for the Court, says, that Judges of Courts of superior or general jurisdiction, are not liable in civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and alleged to have been done maliciously and corruptly, and states, that a distinction is to be observed between excess of jurisdiction, and a clear absence of all jurisdiction over the subject-matter. *Folkard's Starkie on Slander*, sec. 197, *top p.* 256; *Rex vs. Skinner*, *Lofft*, 55; *Scott vs. Stansfield*, *L. R.*, 3 *Exch.*, 220.

The doctrine that a witness, whether he delivers his testimony orally or by affidavit, is exempt from liability in a civil action for words spoken or written in the course of his testimony, is very ancient.

In the old case of *Astley vs. Younge*, 2 *Burr.*, 807, which was an action on the case for libel, charging the defendant with making a false and malicious affidavit in a proceeding in the King's Bench, a demurrer was interposed. The report says that after the plaintiff's counsel had finished his argument, Lord MANSFIELD told the defendant's counsel that "it was unnecessary to speak to it, as the matter was so plain;" and said "there can be no scandal if the allegation is material, and if not, the Court before whom the indignity is committed by immaterial scandal may order satisfaction, and expunge it out of the record if it be upon the record."

The case of *Revis vs. Smith,* 18 *C. B.,* 126, decided in the Exchequer Chamber in 1856, fully sustains the absolute privilege of witnesses.

*Henderson vs. Broomhead,* 4 *Hurl. & N.,* 569, was decided in the Exchequer Chamber in 1859. MARTIN, B., before whom the cause was tried, held that even if the slanderous words were shown to be malicious and false to the knowledge of the defendant, still the action could not be maintained, and his judgment was unanimously affirmed in the Exchequer Chamber.

The case of *Dawkins vs. Lord Rokeby,* was first tried before Justice BLACKBURN. That eminent Judge applied the doctrine of absolute privilege to a witness examined before a military Court, and held that the action could not be maintained "although the defendant had acted *mala fide* and with actual malice and without any reasonable and probable cause, and with a knowledge that the statement made by him was false." In the Court of Exchequer nine Judges upheld this ruling of Justice BLACKBURN. (*L. R.,* 8 *Queen's Bench,* 255.) The same case was then taken to the House of Lords. The Lord Chancellor said: "Their Lordships had agreed to put the following question to the learned Judges who were in attendance, whether the opinion and the ruling of the learned Judge as stated in the bill of exceptions were right in point of law?"

The Judges' reply was: "We answer your Lordship's question in the affirmative. A long series of decisions has settled that no action will lie against a witness for what he says or writes in giving evidence before a Court of justice. * * * The principle we apprehend is that public policy requires that witnesses should give their testimony free from any fear of being harassed by an action on an allegation, whether true or false, that they acted from malice. The authorities as regards witnesses in the ordinary Courts of justice are numerous and uniform."

All the Lords concurred in affirming the judgment, and Lord PENZANCE based his judgment in favor of Lord ROKEBY upon the ground of public policy, which required that all witnesses should feel themselves at liberty to give their evidence without fear of being dragged into litigation for something which they might rightly or wrongly have stated. See *Calkins vs. Summer*, 13 *Wis.*, 192; *Barnes vs. McCrate*, 32 *Maine*, 442; *Seaman vs. Netherclift*, 19 *Eng. Report*, (*Moak*), 310.

There are only two cases, *White vs. Carroll*, 42 *N. Y.*, 161, and *Smith vs. Howard*, 28 *Iowa*, 57, which support the view that a person is liable for words spoken maliciously on the witness stand. The authorities referred to in these cases do not support the position taken, and as the *Central Law Journal* says, "may be passed by without disrespect to the Courts, as having been erroneously decided." 2 *Central Law Journal*, 518.

If the Judge upon the bench is absolutely privileged and also the witness, there should be no question about the privilege of the advocate. His position is a peculiar one and of the utmost difficulty. He receives his information from others and often through biased channels. He deals with the motives of people. It is his duty to investigate, sift and scrutinize: to detect, expose and denounce fraud and its guilty agents. He is an advocate; his feelings become enlisted; his zeal is aroused and his indignation is often excited.—Difficulties frequently arise in the trial of a cause which give but little time to reflect and consider. He is an officer of the Court, necessary for the investigation of truth and an important factor in the administration of law and justice. If he is to weigh his words before he utters them; if, in the heat of his argument, he is to consider and determine whether or not what he says is relevant or irrelevant; if he is to have a constant dread of being harassed by suits instituted by disappointed

Maulsby *vs.* Reifsnider.

suitors or by witnesses whose testimony may deserve close criticism, then his mind is not free; he is hampered and not in a position to perform his duty, and the most potent arm of the Court in the investigation of truth, in exposing frauds and in protecting the weak against the oppressions of the strong and unscrupulous, is palsied and withered.

An attorney is not a free lance, without restraint. The law regulates his admission to the bar and the statute requires him to be a man of good moral character. The case of *Munster vs. Lamb*, 37 *Eng. Rep.*, 579, decided by the Court of Appeals, is conclusive upon this question. See *Maurice vs. Worden*, 54 *Md.*, 233; *Snyder vs. Fulton*, 34 *Md.*, 137; *McBee vs. Fulton*, 47 *Md.*, 423; *Johnson vs. Brown*, 13 *W. Va.*, 71.

ROBINSON, J., delivered the opinion of the Court.

This is a suit against an attorney at law for slander. The defendant pleads in bar of the action, that the alleged defamatory words set out in the declaration were spoken by him in his capacity as counsel, in the trial of a cause in a Court of justice. To this, the plaintiff replied that the words thus spoken, were not spoken in reference to said cause, and "had no reference to said action, or to any subject-matter involved in said action, or to any judicial inquiry which was going on, or being had in said action." To this replication, the defendant demurred, and in sustaining the demurrer, the Court decided as matter of law, that if the defamatory words were spoken by the defendant as counsel in the trial of a cause in a Court of justice, the action could not be maintained, even though the plaintiff should prove that the words thus spoken were false, and were known to be false by the defendant, and even though they were spoken maliciously, and even though they had no reference to said cause or to any

subject-matter or to any judicial inquiry involved in said action. In other words, the Court decided that the privilege of counsel in *the trial of a cause* is an *absolute* and *unqualified privilege*, and although he is subject to the authority of the Court for the abuse of this privilege, and may be punished for misbehavior or misconduct, he cannot be held liable in an action of slander brought by the person injured.

The question which is thus presented for the first time for the decision of the Court is one of great importance, involving on the one hand the rights and privileges of counsel in the trial of causes in the discharge of a professional duty; and on the other the rights of the citizen whose character may have been maliciously and wantonly assailed. The case has been very fully and ably argued on both sides, and reference has been made to nearly all the decisions both in England and in this country on the subject. All agree, that counsel are privileged and protected to a certain extent, at least, for defamatory words spoken in a judicial proceeding, and words thus spoken are not actionable, which would in themselves be actionable, if spoken elsewhere. He is obliged in the discharge of a professional duty to prosecute and defend the most important rights and interests, the life it may be, or the liberty or the property of his client, and it is absolutely essential to the administration of justice that he should be allowed the widest latitude in commenting on the character, the conduct and motives of parties and witnesses and other persons directly or remotely connected with the subject-matter in litigation. And to subject him to actions of slander by every one who may consider himself aggrieved, and to the costs and expenses of a harassing litigation, would be to fetter and restrain him in that open and fearless discharge of duty which he owes to his client,

and which the demands of justice require. Not that the law means to say, that one, because he is counsel in the trial of a cause, has the right, abstractly considered, deliberately and maliciously to slander another, but it is the fear that if the rule were otherwise, actions without number might be brought against counsel who had not spoken falsely and maliciously. It is better therefore to make the rule of law so large that counsel acting *bona fide* in the discharge of duty, shall never be troubled, although by making it so large, others who have acted *mala fide* and maliciously, are included. The question whether words spoken by counsel were spoken maliciously or in good faith, are, and always will be, open questions, upon which opinion may differ, and counsel, however innocent, would be liable if not to judgments, to a vexatious and expensive litigation. The privilege thus recognized by law is not the privilege merely of counsel, but the privilege of clients, and the evil, if any, resulting from it must be endured for the sake of the great good which is thereby secured. But this privilege is not an absolute and unqualified privilege, and cannot be extended beyond the reason and principles on which it is founded. The question then is what is the extent and limit to this privilege? This can best be answered by a consideration of the cases in which it has been determined.

In the earliest of the leading cases on the subject, *Brook vs. Sir Henry Montague, Croke Jac.,* 50, decided in 1605, and argued by Lord Coke, and Yelverton, it was held that this privilege protected counsel, provided the slanderous words spoken were relevant or pertinent to the matter. "But matter" said POPHAM, J., "not pertinent to the issue or matter in question he need not deliver, for he is to discern in his discretion what he is to deliver and what not, and although it be false, he is excusable being pertinent to the matter."

Maulsby *vs.* Reifsnider.

Subsequently in the noted case of *Hodgson vs. Sir James Scarlett,* afterwards *Lord Abinger,* 1 *Barn. & Ald.,* 232. the rule laid down in *Brook vs. Montague,* was expressely recognized and approved. This case was elaborately argued, and was decided after full consideration, each of the Judges delivering his own views.

Lord ELLENBOROUGH whilst admitting that the language used by the defendant was too strong, and too much to say, as between man and man, yet held that the action could not be maintained because the words spoken were pertinent to the issue.

Justice BAYLEY, said: "The rule seems to be correctly laid down in *Brook vs. Sir Henry Montague,* 'that a counsellor hath a privilege to enforce anything which is informed unto him for his client, and to give it in evidence, it being pertinent to the matter in question, and not to examine whether it be true or false.' No mischief will ensue in allowing the privilege to that extent."

Mr. Justice ABBOTT: "The words were spoken in a course of judicial enquiry, and were relevant to the matter in issue. It would be impossible that justice could be well administered, if counsel were to be questioned for the too great strength of their expressions."

Mr. Justice HOLROYD, after referring to *Buckley vs. Wood,* 4 *Coke Rep.,* 146, and *Cutler vs. Dixon,* 4 *Coke,* 14, says: "These cases show the privilege possessed by parties themselves; and from these authorities it appears that no action is maintainable against the party, nor consequently against counsel who is in a similar situation, for words spoken in the course of justice if they be fair comments upon the evidence and be relevant to the matter in issue."

Again in *Mackay vs. Ford*, 5 *Hurl. & Norman*, 790, POLLOCK, C. B., referring to the slanderous matter complained of said: "The question is, was it relevant? I think it was, because it was pertinent to the question whether the agreement had been fully determined. The words were used by the defendant in the character of counsel in a Court of justice, and being relevant to the matter in hand, the speaking of them was justifiable."

BRAMWELL, J.: "The words spoken, having been pertinent to the question * * * the rule must be absolute to enter a non-suit."

CHANNELL, B.: "The words in question were spoken in the course of a judicial proceeding in which they were not irrelevant."

It thus appears that from the decision in *Brook vs. Montague*, in 1605, to *Mackay vs. Ford*, decided in 1860, a period of more than two hundred and fifty years, *relevancy of the words spoken was considered essential to justify the privilege.* And so the law was understood by all the most eminent commentators on the subject.

BLACKSTONE says: "A counsellor is not answerable for any matter spoken relative to the cause in hand; if it be impertinent to the cause in hand he is then liable to an action from the party injured." In *Folkard's Starkie on Slander*, 4 *Eng. Ed.*, sec. 362, and *Addison on Torts, Ed.*, 1870, the privilege of counsel is limited expressly to words *relative to the inquiry*.

We come now to *Munster vs. Lamb, Law Rep.*, 11 *Q. B. Div.*, 588, decided in 1883, which is relied on in support of the ruling below. In that case, it was held that no action will lie against counsel for slanderous words spoken with reference to, and in the course of, an inquiry before a judicial tribunal, although they were uttered maliciously and without any justification or even excuse, and from personal ill-will towards the person slandered, arising out of a previously existing

Maulsby *vs.* Reifsnider.

cause, and are irrelevant to every issue of fact contested before the Court.

Brett, Master of the Rolls, said: "For the purpose of my judgment, I shall assume that the words complained of were uttered by the solicitor maliciously; that is to say, not with the object of doing something useful towards the defence of his client; I shall assume that the words were uttered without any justification or even excuse, and from the indirect motive of personal ill-will or anger towards the prosecutor, arising out of some previously existing cause; and I shall assume that the words were irrelevant to every issue of fact which was contested in the Court where they were uttered; nevertheless, inasmuch as the words were uttered with reference to, and in the course of, the judicial inquiry which was going on, no action will lie against the defendant, however improper his behavior may have been." "The rule is founded upon public policy. With regard to counsel, the question of malice, *bona fides*, and relevancy cannot be raised; the only question is, whether what is complained of has been said in the course of the administration of the law. If that be so, the case against counsel must be stopped at once. No action of any kind, no criminal prosecution can be maintained against a defendant, when it is established that the words complained of were uttered by him as counsel in the course of a judicial inquiry."

Fry, L. J., was of the same opinion. A judgment thus deliberately rendered by Judges so eminent, is entitled, of course, to the highest consideration; but with deference we must say that the absolute and unqualified privilege as thus laid down, is not, in our opinion, supported by *Revis vs. Smith, Henderson vs. Broomhead, Dawkins vs. Lord Rokeby* or *Seaman vs. Netherclift,* the cases relied on by the Court; nor can it be sustained by any sound principle of public policy.

Now in *Revis vs. Smith*, 18 *Com. Bench*, 125, the count in the declaration is not *for libel*, but for *maliciously*, and *without reasonable* and probable cause, making a false affidavit in a cause pending in chancery, containing injurious representations against the plaintiff as an auctioneer, by means of which the Court declined to appoint him as auctioneer to sell certain real estate.

Mr. Justice CRESWELL rested his judgment on the ground that the action was without precedent, and that it would be highly inconvenient to hold a witness liable where he gave evidence *relevant to the cause.*

Mr. Justice CROWDER treated the case as an attempt to introduce an entirely new form of action, in substance an action for defamation against a witness for giving evidence to the best of his belief in a Court of justice.

Mr. Justice WILLES said: "I apprehend the law to be, that, however harsh or hasty, or even untrue, may be the conduct of a person speaking on a privileged occasion, if he honestly and *bona fide* believes what he utters to be true, no action will lie."

Lord Chief Justice JERVIS was of the opinion that the action was a novel one and without precedent to sustain it, and endorsed fully the law of privilege as laid down by HOLROYD, J., in *Hodgson vs. Scarlett.*

Now in *Henderson vs. Broomhead*, 4 *Hurl. & Nor.*, 567, the Court decided that an action would not lie against a party who in a cause pending in Court makes affidavit in support of a summons taken out in such cause, which is scandalous, false and malicious, and though the person slandered was not a party to the cause. But there the scandalous matter was *pertinent to the subject-matter before the Court.*

ERLE, J., said: "I do not assent to the proposition that the matters which form the subject of this charge

were irrelevant. I can easily see how they might be relevant."

CROMPTON and CROWDER, JJ., state broadly, it is true, that no action will lie for words spoken or written in the course of any judicial proceeding; but it must be borne in mind they were speaking in reference to defamatory words, which in the opinion of all the Judges were relevant to the then pending litigation. We come then to *Dawkins vs. Lord Rokeby, L. R.,* 7 *English and Irish App.,* 752, about which so much has been said. There the defendant, a military man, was sued for slanderous words spoken and written by him as a witness before a military Court. The case was tried before Mr. Justice BLACKBURN, who held that inasmuch as the verbal and written statements were made by the defendant, being a military man, in the course of a military inquiry in relation to the conduct of the plaintiff being a military man, and with *reference* to the subject of that inquiry, the action could not be maintained, although the plaintiff should prove that the defendant had acted *mala fide*, and with actual malice, and with a knowledge that the statements so made by him were false. In other words, the defamatory words having been spoken and written by the defendant as a witness before a military Court, and having reference to the subject-matter before that Court, they were privileged, and whether they were spoken maliciously and falsely were questions altogether immaterial. Upon appeal to the House of Lords, Lord Chancellor CAIRNS said: "My Lords, I think it is of great importance that your Lordships should bear in mind these precise expressions which I have now read, because I feel sure that your Lordships would not desire your decision upon the present occasion to go farther than the circumstances of this particular case would warrant. Now, my Lords, adopting the expres-

sions of the learned Judges with regard to what I take
to be settled law as to the protection of witnesses in
judicial proceedings, I am certainly of opinion that
upon all principles, and certainly upon all considera-
tions of convenience and of public policy, the same
protection which is extended to a witness in a judicial
proceeding who has been examined on oath, ought to be
extended, and must be extended, to a military man
who is called before a Court of Inquiry of this kind for
the purpose of testifying there upon a matter of mili-
tary discipline connected with the army. It is not
denied that the statements which he made, both those
which were made *viva voce* and those which were made
in writing, were relative to that inquiry." Now in
this case the House of Lords decided that a witness
testifying before a military Court was entitled to the
same privilege as a witness testifying in a judicial pro-
ceeding, and that no action would lie against the defen-
dant because both what he said, and what was written by
him had *reference* (*"relative"* is the term used) to
the military discipline of the army which was the mat-
ter of inquiry before the military Court. The Lord
Chancellor was careful to say, that he did not desire
the decision to go farther than the circumstances of
that particular case would warrant.

The question was again very fully considered in
*Seaman vs. Netherclift, Law Rep.,* 2 *Com. Pleas Div.,*
53, decided in 1876, one year after *Dawkins vs. Lord
Rokeby,* in which all the Judges delivered opinions
*seriatim.*

COCKBURN, C. J., after stating in a general way that
it was well settled that a witness was privileged to
the extent of what he says in course of his examination,
and that this privilege was not affected by the
relevancy or irrelevancy of his testimony, qualifies the
broad declaration thus made by him, by saying that,

Maulsby *vs.* Reifsnider.

" if a man when in the witness-box were to take advantage of his position to utter something having no reference to the cause or matter of inquiry, in order to assail the character of another, as if he were asked: Were you at York, on a certain day? And he were to answer: yes, and. A. B. picked my pocket there; it certainly might well be said in such a case, that the statement was altogether *dehors* the character of witness, and not within 'the privilege.'" In that case, however, he said the words spoken were relevant.

BRAMWELL, J. A.: " The judgment of the Common Pleas affirmed two propositions—First, that what the defendant said, was said as a witness, and was relevant to the inquiry before the magistrate; and secondly, that that being so, the Lord Chief Justice should have stopped the trial of the action by non-suiting the plaintiff. As to the first proposition, I am by no means sure that the word 'relevant' is the best word that could be used; the phrases used by the Lord Chief Baron, and the Lord Chancellor in *Dawkins vs. Lord Rokeby*, would seem preferable, having reference, or made with reference, to the inquiry. I can scarcely think a witness would be protected for anything he might say in the witness box, wantonly and without reference to the inquiry.

Mr. Justice AMPHLETT, considered there was but one question open for the decision of the Court, and that was whether the answer was relevant, and being of the opinion that it was, the defendant was within the privilege. Now, in all these cases, the slanderous words spoken were relevant, or had reference, to the matter of inquiry before the Court, and this being so, what was said by the several witnesses was, according to all the authorities, strictly within the well recognized law of privilege. In all these cases the answers of the several witnesses had in the opinion of the

Court reference to the subject-matter of inquiry, and in neither of these cases was it decided that the privilege even of a witness was an absolute privilege, and that he could take advantage of his position to utter something, in the language of COCKBURN, C. J., "having no reference to the cause or matter of inquiry in order to assail the character of another."

We should not stop to consider the dictum of Lord MANSFIELD in *Rex vs. Skinner,* decided in 1772, and only reported in *Lofft,* 55, but for the fact that it is relied on by the Court in *Munster vs. Lamb.* In that case a motion was made to quash an indictment against a magistrate for slanderous words spoken to a Grand Jury at a general session of the county. The indictment was quashed on the ground that it would be subversive of the Constitution to hold a judicial officer answerable either civilly or criminally for words spoken in office. Lord MANSFIELD is reported as saying in that case "What Mr. Lucas, the defendant's counsel has said is very just; neither party, counsel, nor Judge can be put to answer civilly or criminally for words spoken in office." Now in *Brook vs. Montague,* the Court after full argument had expressly decided that counsel was protected, provided the words spoken were *relevant* or *pertinent* to the matter of inquiry, but that for words not pertinent he was liable. We can hardly suppose so eminent a Judge as Lord MANSFIELD meant in this off-hand way to overrule or even question the law of privilege as laid down in that case. And when speaking of counsel we must conclude he meant that they were not liable civilly or criminally for words spoken, relevant to the subject-matter before the Court. And besides, in the subsequent case of *Hodgson vs. Scarlett,* in which the question of privilege of counsel was directly involved, and which was argued by distinguished counsel on both sides, this reported dictum

Maulsby *vs.* Reifsnider.

of Lord MANSFIELD is neither referred to by counsel, nor by either of the Judges who delivered opinions in that case. And all the Judges held, relying upon the decision in *Brook vs. Montague* as authority, that the defendant was *protected* because the words spoken by him were *relevant and pertinent*. And the same rule was again laid down in *Mackay vs. Ford*. So, if Lord MANSFIELD was correctly reported, this *dictum* was not understood as qualifying in any manner the well settled law on the subject.

Passing then from the English to the American decisions, we find that the highest Courts in this country have uniformly held that the privilege of counsel is limited to words spoken, which are pertinent, or which have relation to the matter of inquiry.

In the early case of *McMillan vs. Birch*, 1 *Binney*, 178, Chief Justice TILGHMAN speaking of counsel and party said: "If any man should abuse this privilege, and under pretence of pleading his cause, wander *designedly* from the point in question, and maliciously heap slander upon his adversary, I will not say that he is not responsible in an action at law."

In *Hoar vs. Wood*, 3 *Metcalf*, 193, SHAW, C. J., said: "Still, this privilege must be restrained by some limit; and we consider that limit to be this; that a party or counsel shall not avail himself of his situation, to gratify private malice by uttering slanderous expressions, either against a party, witness or third person, which have no relation to the cause or subject-matter of the inquiry."

And in *Hastings vs. Lusk*, 22 *Wend.*, 410, Chancellor WALWORTH says: "Upon a full consideration of all the authorities on the subject, I think that the privilege of counsel in advocating the causes of their clients, and of parties who are conducting their own causes, belongs to the same class where they have confined themselves to

what was relevant and pertinent to the question before the Court."

We may also refer to the following cases in which this privilege has been held to be a limited and not an unqualified privilege: *Ring vs. Wheeler*, 7 *Cowen*, 725; *Shelfer vs. Gooding*, 2 *Jones Law, N. C.*, 175; *Jennings vs. Paine*, 4 *Wis.*, 372; *Lea vs. White*, 4 *Sneed, Tenn.*, 111; *Johnson vs. Brown*, 13 *W. Va.*, 71; *Stackpole vs. Hennen*, 6 *Martin, La.* (*N. S.*,) 481; *McLaughlin vs. Cowley*, 127 *Mass.*, 319; *Mower vs. Watson*, 11 *Vert.*, 536.

In view, then, of this unbroken line of decisions both in England and in this country, we cannot accept the absolute and unqualified privilege laid down in *Munster vs. Lamb.* [It is in the teeth of the decisions in *Brook vs. Montague*, and *Hodgson vs. Scarlett* and *Mackay vs. Ford*, and is not sustained by *Revis vs. Smith*, *Henderson vs. Broomhead*, *Dawkins vs. Lord Rokeby* or *Seaman vs. Netherclift.*] We cannot agree with BRETT, M. R., that in a suit against counsel for slander *the only inquiry is whether the words were spoken in a judicial proceeding, and if so, the case must be stopped.* We quite agree however with BRAMWELL, J. A., in *Seaman vs. Netherclift*, that "*relevant*" and "*pertinent*" are not the best words that could be used. These words have in a measure a technical meaning, and we all know the difficulty in determining in some cases what is relevant or pertinent. With Lord Chancellor CAIRNS we prefer the words "*having reference*" or "*made with reference*," or in the language of SHAW, C. J., "*having relation to the cause or subject-matter.*" And if counsel in the trial of a cause maliciously slanders a party, or witness or any other person in regard to a matter that has no *reference* or *relation* to, or connection with, the case before the Court, he is and ought to be answerable in an action by the party injured. This qualification of his

Maulsby *vs.* Reifsnider.

privilege in no manner impairs the freedom of discussion so necessary to the proper administration of the law, nor does it subject counsel to actions for slander except in cases in which upon reason and sound public policy he ought to be held answerable. We cannot agree that for the abuse of his privilege he is amenable only to the authority of the Court. Mere punishment by the Court, is no recompense to one who has thus been maliciously and wantonly slandered.

We are of opinion therefore that the twelfth replication in this case, that the words spoken by the defendant, were not spoken in reference to the cause then on trial, and had no reference to any subject-matter involved in said action, or to any judicial inquiry which was going on, or being had in said action, is a good replication, and the demurrer thereto ought to have been overruled.

But as the demurrer filed by the plaintiff mounts up to the first error in pleading, we are also of opinion, that this action cannot be maintained, because it appears upon the face of the declaration, that the alleged defamatory words, spoken by the defendant, had reference to the subject-matter involved in the cause then on trial. The words were spoken by the defendant as counsel for Byers and wife in a suit against them by the plaintiff in this case to recover money alleged to be due to him for professional services. The words set out in the declaration are as follows: "He, meaning the plaintiff, as attorney for Mrs. Byers, collected for her five thousand dollars of her money and refused to account to her, and kept it, and still has it, and refused to pay it over to her, and I am determined to rip up and expose the whole disgraceful transaction." Whether the defendants in that case could have offered evidence to prove these facts under the pleadings filed at that time we shall not stop to consider. Admit that

such evidence would have been inadmissible, under the then state of pleadings, yet the defendants had the right to amend their pleas at any time before the jury retired to make up their verdict, and it is plain that under a plea of *set-off* such evidence would have been admissible.

But, be that as it may, the plaintiff in that case, who is the plaintiff in this, was claiming to recover money alleged to be due him by the defendants for professional services. And in such a case the words alleged to have been spoken by the defendant in that case in his capacity as counsel, to the effect that plaintiff had in his possession money which he had collected for and which belonged to the defendants, had reference to the subject-matter of inquiry before the Court. And if they had reference or relation to the case on trial, then they are strictly within the rule of privilege and whether they were true or false, or whether they were spoken maliciously or in good faith, are questions altogether immaterial,—being privileged no action will lie against the defendant. This being so the evidence offered by the plaintiff for the purpose of proving them to be false, and that they were maliciously spoken was inadmissible, and there was no error in the ruling of the Court in this respect. And for the same reason, the defendant's prayer, that there was no proof legally sufficient upon which the jury could find a verdict for the plaintiff was properly granted. And although the Court erred in sustaining the demurrer to the plaintiff's twelfth replication, yet inasmuch as the words set out in the declaration were spoken by the defendant as counsel, and had reference to the subject-matter then before the Court, this action cannot be maintained and the judgment must therefore be affirmed.

*Judgment affirmed.*

(Decided 13th June, 1888.)

Maulsby *vs.* Reifsnider.

McSHERRY, J., filed the following opinion:

I am of opinion that the judgment in this case ought to be affirmed, but I base that conclusion upon the broad ground that the privilege pleaded by the appellee is an absolute and not a qualified one. If the question as to the character of the privilege be an open one in this State since the decision in *Maurice vs. Worden,* 54 *Md.,* 233, there is ample authority elsewhere to support either view that may be taken. But it seems to me that the cases which uphold the absolute privilege of an attorney are grounded upon correct principles, are supported by the most satisfactory reasoning and are sustained by a sound and conservative public policy.

Lord MANSFIELD observed in *Rex vs. Skinner, Lofft,* 56, that "neither party, witness, counsel, jury nor Judge can be put to answer civilly or criminally for *words spoken in office.*" Some refined distinctions were subsequently engrafted on this doctrine, but they have been swept away, and finally the Courts of England have re-asserted and enforced this rule with emphasis, and it stands to-day the settled and undisputed law of that country. The correctness of this decision of Lord MANSFIELD, in so far as it applied the privilege to Judges, has never, that I am aware of, been questioned either in England or in this country. It is a general principle of the highest importance to the proper administration of justice that a judicial officer in exercising the authority vested in him shall be free to act upon his own convictions, without apprehension of personal consequence to himself. Liability to answer to every one who might feel himself aggrieved by the action of the Judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful. The principle which exempts Judges of Courts of superior or general authority from

liability in a civil action for acts done by them in the exercise of their judicial functions obtains in all countries where there is any well ordered system of jurisprudence. *Bradley vs. Fisher*, 13 *Wal.*, 335. Nor does the motive which influenced the act affect the question of liability, because an inquiry into the motive of the Judge would, as said in *Floyd vs. Barker*, 12 *Coke*, 25, "tend to the scandal and subversion of all justice, and those who are the most sincere, would not be free from continual calumniations." This immunity, remarked Chancellor KENT, in *Yates vs. Lansing*, 5 *Johns.*, 291, has "a deep root in the common law;" and he likewise observed, in the same case, "that it has been steadily maintained by an undisturbed current of decisions in the English Courts amidst every change of policy and through every revolution of their government." "No man," he further said, "can foresee the disastrous consequences of a precedent in favor of such suits. Whenever we subject the established Courts of the land to the degradation of private prosecutions, we subdue their independence and destroy their authority. Instead of being venerable before the public they become contemptible, and we thereby embolden the licentious to trample upon everything sacred in society and to overturn those institutions which have hitherto been deemed the best guardians of civil liberty."

The Courts have with equal emphasis applied this privilege to witnesses. In the language of Chief Justice COCKBURN in *Seaman vs. Netherclift*, 2 *C. P. D.*, 53, "if there is any thing as to which the authority is overwhelming it is that a witness is privileged to the extent of what he says in course of his examination. Neither is that privilege affected by the relevancy, or irrelevancy of what he says; for then he would be obliged to judge of what is relevant or irrelevant, and questions might be, and are, constantly asked which are not strictly

Maulsby *vs.* Reifsnider.

relevant to the issue. But that, beyond all question, this unqualified privilege extends to a witness is established by a long series of cases, the last of which is *Dawkins vs. Lord Rokeby*, after which to contend to the contrary is hopeless. It was there decided that the evidence of a witness with reference to the inquiry is privileged notwithstanding it may be malicious; and to ask us to decide to the contrary is to ask us what is beyond our power. * * * * A long series of authorities, from the time of Elizabeth to the present time, has established that the privilege of a witness while giving evidence is absolute and unqualified." And in the same case, AMPHLETT, J. A., said: "It is clear, therefore, that the case comes within the rule that has been laid down for two or three hundred years; and it is important that a rule so long established should be strictly adhered to, a rule which was established not for the benefit of witnesses, but for that of the public and the advancement of the administration of justice, to prevent witnesses from being deterred by the fear of having actions brought against them from coming forward and testifying to the truth." In the case of *Dawkins vs. Lord Rokeby* referred to by Chief Justice COCKBURN, the Judges, in the opinion expressed by them in obedience to the request of the House of Lords, said: "A long series of decisions has settled that no action will lie against a witness for what he says or writes in giving evidence before a Court of justice * * * * The principle we apprehend is that public policy requires that witnesses should give their testimony free from any fear of being harassed by an action on an allegation, whether true or false, that they acted from malice." 14 *Eng. R.,* (*Moaks*), 127.

What conceivable reason is there for applying to an attorney a less liberal rule than the one so clearly and explicitly laid down in the cases of Judges and wit-

Maulsby *vs.* Reifsnider.

nesses? It seems to me that the same reasons and the same public policy which support this absolute privilege when invoked by a Judge or by a witness apply with at least equal force and pertinency to the case of an attorney. It is likely, from the very situation which he occupies, that he will need the protection of such a rule for the furtherance of public justice, more than either a Judge or a witness. What he says, in the trial of causes, is often said on the impulse of the moment, under the influence of strong excitement without opportunity for calm reflection or time to measure or to weigh his words. He is called upon to confront vice, to denounce crime, to unmask fraud, to expose its disguises, to explore the hidden and secret ways of the crafty, the cunning and the dishonest. Innocence confides its vindication to his skill, and his fiercest conflicts are often the causes of the weak, the helpless and the oppressed. The property and the reputations of the living, the estates of the dead and the inheritance of the orphan may all be the subjects of his watchful vigilance and anxious solicitude in the trial of causes. Vast pecuniary interests and the most delicate social and domestic relations, when dragged into litigation, demand his ceaseless attention. He becomes identified with the strifes of others and is often visited with the unmerited criticism which the bitter feelings engendered by an angry law suit frequently provoke. He becomes, unconsciously, from the force of circumstances, a partisan in his client's cause. If he is to stop during each of the many occasions when he may thus be engaged in aiding in the administration of justice, and to measure each word before using it lest he incur the perils of a civil suit, whether successfully maintained or not is immaterial, his efficiency would be greatly diminished and his usefulness most seriously impaired.

Maulsby *vs.* Reifsnider.

The doctrine announced by Lord MANSFIELD in *R. vs. Skinner* as respects an attorney is fully supported by the following statement of the rule in 2 *Addison on Torts, sec.* 1133, (*Wood's Edition.*)   " 'If a counsel (or an attorney acting as an advocate) speaks scandalous words against one in defending his client's cause, an action lies not against him for so doing; for it is his duty to speak for his client; and it shall be intended to be spoken according to his client's instructions.'   The freedom of speech of the bar is the privilege of the client vested in the counsel who represents him.   It would be impossible properly to conduct a cause in Court unless considerable latitude were allowed to the advocate, and if any evil happen therefrom, it must be endured for the sake of the greater good which attends it."   See also, *Wood vs. Gunstine, Styles,* 462; *Mackay vs. Ford,* 29 *L. J. Exch.,* 404; *Odgers on Libel and Slander, side page* 193; *Pollock on Torts, top page* 175; *Munster vs. Lamb,* 11 *L. R., Q. B. D.,* 588.   In this last case the question is fully met and explicitly decided.   BRETT, M. R., there said:   "This action is brought against a solicitor for words spoken by him before a Court of justice whilst acting as the advocate for a person charged in that Court with an offence against the law. For the purpose of my judgment, I shall assume that the words complained of were uttered by the solicitor maliciously, that is to say, not with the object of doing something useful towards the defence of his client.   I shall assume that the words were uttered without any justification or even excuse, and from the indirect motive of personal ill-will or anger toward the prosecutor, arising out of some previously existing cause; and I shall assume that the words were irrelevant to every issue of fact which was contested in the Court where they were uttered, nevertheless, inasmuch as the words were uttered with reference to, and in the course of, the judicial inquiry which was going on, no action

will lie against the defendant, however improper his behavior may have been." Then after speaking of the privilege of Judges and witnesses, he proceeded: "Of the three classes, Judges, witnesses and counsel, it seems to me that a counsel has a special need to have his mind clear from all anxiety. * * * * The rule of law is that what is said in the course of the administration of the law is privileged; and the reason of that rule covers a counsel even more than a Judge or a witness. * * * * The rule may be taken to be the rule of the common law. That rule is founded upon public policy. With regard to counsel the questions of malice, *bona fides* and relevancy cannot be raised; the only question is, whether, what is complained of has been said in the course of the administration of the law. If that be so, the case against a counsel must be stopped at once." And FRY, J., was equally emphatic. "If such actions" he remarked "were allowed, persons performing their duty would be constantly in fear of them."

That this privilege is liable to be abused, is not denied. It is also true that its abuse may be productive of great hardships. ROLFE, B., in *Winterbottom vs. Wright*, 10 *M. & W.*, 115, answering a similar objection urged however in a case not analogous to this, observed, "this is one of those unfortunate cases in which there certainly has been *damnum*, but it is *damnum absque injuria*; it is, no doubt, a hardship upon the plaintiff to be without a remedy, but, by that consideration we ought not to be influenced. Hard cases, it has been frequently observed, are apt to introduce bad law." It is obvious, therefore, that such a consideration ought not to prevail as a sufficient reason for qualifying the privilege, if it be otherwise well founded and correct in principle. Far greater mischiefs will result, and the administration of justice will be more seriously

Maulsby *vs*. Reifsnider.

interfered with by a relaxation of this doctrine and by the toleration of suits against attorneys, witnesses and parties for "words spoken in office;" than can possibly grow out of the rare instances where, in an honorable profession, the privilege may be abused, or availed of for purely malevolent purposes. There is no unbending rule of law which does not or may not work, at some time, some hardship to some individual. In the very nature of things this is essentially so. But where the reasons for its adoption are plain and unmistakable, and where the public security and tranquillity and the due, untrammelled administration of justice outweigh the private interest or the private right, the latter must yield in obedience to a principle that is universal in its application though frequently harsh in its consequences. Or, as the doctrine is more clearly stated in *Broom's Legal Maxims, page* 41: "In the imperfection of human nature, it is better even that an individual should occasionally suffer a wrong, than that the general course of justice should be impeded and fettered by constant and perpetual restraints and apprehensions on the part of those who are to administer it." The principle in all such cases is that the law will rather suffer a private mischief than a public inconvenience. *Johnson vs. Sutton,* 1 *T. R.,* 512. When it is remembered that the trial Court has full authority to check and to punish summarily any violation of this privilege, to the extent even of disbarring the offender, the danger of its being abused, in actual practice, greatly diminishes.

Nor is there any greater force, it seems to me, in the argument drawn from the maxim that wherever there is a wrong there also there should be a remedy. Considerable stress is laid upon this in many of the cases restricting the privilege. The maxim when rightly understood and applied is both salutary and reason-

able; but some confusion has arisen from a misconception of its scope and from unguarded and incautious applications of it to cases where properly it was wholly inapposite. To assert that words spoken by an attorney in a Court of law during the progress of judicial proceedings, in the conduct or defence of which he is engaged in his professional capacity, are, because defamatory and false, a wrong in the sense in which that word is used in the maxim quoted; and then to conclude from that assertion that an action lies against the attorney who used the words; is to assume, as proved, the very question at issue, the very point to be determined. Now, it is very well known that it is not literally and universally true that there is a remedy for every wrong; because there are many invasions of rights for which there exist no remedies, and each of these is denominated, in legal nomenclature, a *damnum absque injuria.* To attribute, therefore, to the maxim a universal application, when it is not in fact universal; and then to assume, as the argument does, that the words spoken, under the conditions indicated, are within that application, is palpably illogical and erroneous. Words thus spoken would occasion an actionable wrong unless they are privileged; and thus, notwithstanding the maxim, the fundamental question recurs, are such words, so spoken, privileged or not?

I am aware that most of the American cases have not gone to the length of holding the privilege to be an unqualified one; and that they generally have decided that the attorney was exempt from liability provided the words spoken or written by him were relevant, pertinent or had reference to the subject-matter under judicial investigation. But this qualification deprives the privilege of its only value. If the attorney may be sued for words spoken in the course of a judicial inquiry because the words are assumed to be irrelevant to that

inquiry, he would be subjected to the vexation and harassment incident to the defence of such a suit, even though he should succeed in demonstrating the pertinency of the language complained of.   The *liability* to be sued is the thing which will fetter and trammel the counsel in the discharge of his duty quite as much as any apprehension of the consequences of such a suit. If he is liable to be sued for the speaking of·words alleged to be irrelevant, he can never know, with certainty, what, upon the trial of such an action against him, the Court may consider irrelevant; and thus the apprehension of being called upon to defend a suit against himself for words which *he* may have thought relevant, would deter him from discharging his duty as fully and freely as he would otherwise have been able to do.   The fear of being sued by a totally irresponsible person for words in fact relevant, but alleged to be irrelevant, might, and most naturally would, cause him an anxiety not consistent with a free and uncramped fulfillment of his obligations to his client.   Whether the words which he uses are or are not relevant he is still, under this qualified privilege, liable to be sued for them, even though the action would ultimately fail; and much of his time would be necessarily occupied in establishing the relevancy of his words as a defence to the suits which the disappoint-ment or chagrin of defeated parties or impeached witnesses might, in a spirit of resentment, prompt them to bring against him.   It is no answer to say that if he has kept within the limits of the qualified rule he will escape being punished in damages; because the mere fact that he is *liable* to be sued at all and that he must make a defence founded on the relevancy of his words, deprives those persons whom he represents of the benefits, which, a freedom and fearlessness on his part would secure to them, in the administration of

the law. It is therefore infinitely better that the door be closed against all suits. If "what is complained of has been said in the course of the administration of the law  *  *  *  *  the case against a counsel must be stopped at once." Otherwise, it seems to me, the qualification of the privilege defeats the beneficial effects of the rule itself; and, instead of merely abridging its application, practically neutralizes and destroys it altogether.

Then again, who is, under this qualification of the English rule, to determine whether the language complained of is or is not relevant or pertinent? In some of the cases it is said to be a question for the Court, and in others it is said to be a question for the jury. In at least one of the American cases, *Hustings vs. Lusk*, 22 *Wend.*, 410, this question of relevancy and pertinency was not only submitted to but was passed upon by the jury. It seems to me too plain for argument that a jury is surely not the proper tribunal to decide whether remarks made by an attorney in the progress of a judicial investigation are relevant or pertinent to that proceeding. And yet, if the privilege be held to be a merely conditional or qualified one, depending upon the relevancy of the objectionable words, I do not see how it is possible to prevent a jury in Maryland from exercising that function, if the words are written or printed in a brief instead of being spoken orally, and the attorney is indicted instead of being sued civilly; because in this State under the Constitution juries are made, in criminal cases, judges of the law as well as of the facts. To subject an attorney to the annoyance of an indictment and then to the perils of a conviction by a jury who may happen to think that words used by him in a brief filed, for instance, in this Court, were irrelevant to the cause he was arguing; would fatally destroy his freedom of action and utterly cripple his

usefulness as an essential officer of the Court in the
due administration of justice. This would be against
the plainest dictates of public policy; and ought not,
under any circumstances, to be tolerated. The obser-
vation of Chief Justice COLERIDGE is as apposite here
as it was to the case in which he used it; viz.,
"But if a rule is established, as the rule as to the
privilege of a witness *is* established, it is the duty of a
Judge to give it a reasonable interpretation, and not,
while admitting it in terms, to attempt to evade it or
fritter it away in its application to particular cases."
*Seaman vs. Netherclift, supra.*

Again: It is expressly provided by *Sec.* 18 *of Art.* 3,
of the Constitution of this State that "no Senator or
delegate shall be liable in any civil action or criminal
prosecution, whatever, for words spoken in debate."
It is obvious that this provision was made for some
useful purposes, and it is equally clear that those pur-
poses must have been considered of sufficient conse-
quence to outweigh all the evils and hardships which
might possibly flow from the abuse of such an unre-
stricted privilege. The framers of that instrument
and the people, who by their votes adopted it, mani-
festly deemed it unwise and impolitic that those who
were charged with the responsibility of making and
enacting laws, should be held answerable for words
spoken by them in the performance of that important
duty. And this could only have proceeded upon the
theory that they ought to be perfectly free and un-
trammelled when discussing and considering measures
affecting the public interest and concerning the wel-
fare of the State. The privilege thus accorded them
is an absolute one, in no manner depending upon the
relevancy, good faith or truth of the words that may
be spoken. Why, then, should there be, upon princi-
ple, a different rule applied to those whose duty (diffi-

cult always and of an equally important character) is
to aid in the just and impartial administration of
those very same laws? What principle can be imagined
as a justification for the rule in the one case that will
not be equally cogent as a reason for its application in
the other? Inasmuch as the most formal declaration
of the organic law of the State exempts the law-maker
from liability in this instance, we would be warranted,
in my judgment, even if there were no other reasons
for doing so, in extending that exemption to the advo-
cate and attorney, when the reasons therefor are pre-
cisely and identically the same and the necessity is
equally as urgent, if not, in fact, greater.

But apart from all other considerations, the question,
it appears to me, has been distinctly settled in this State,
by the decision of this Court in *Maurice vs. Worden*, 54
*Md.*, 233. That was an action for an alleged libel.
Maurice was a teacher at the Naval Academy, in
Annapolis. Worden was the Superintendent of the
Academy. Maurice tendered his resignation, and
Worden endorsed upon it the alleged libelous words
and forwarded it, as required by the regulations govern-
ing the Navy, to the Secretary of the Navy. Suit was
thereafter brought by Maurice against Worden. The
Court of Common Pleas of Baltimore, instructed the
jury that no evidence had been given legally sufficient
to entitle the plaintiff to recover, and the verdict and
judgment being against him, Maurice appealed to this
Court. The question was there directly raised as to
whether the endorsement on the resignation furnished
a cause of action; and that turned upon the inquiry
whether that endorsement or communication to the
Secretary of the Navy was within the limits of a privi-
lege, either absolute or qualified. As the case was
presented, before it could be held that the action was
maintainable, it was necessary for the Court to deter-

mine that Worden was not, under the circumstances, entitled to invoke, in his defence, either the absolute or the qualified privilege. In other words, it was necessary for the Court to decide whether his communication fell within the scope of any privilege. To do that intelligently, it was requisite for the Court to define clearly the two classes of privileged communications. In approaching that subject, this Court said: "There are two classes of privileged communications which form exceptions to the general law of libel. The one is absolutely privileged and cannot be sued upon, while the other may be the cause of action, and the suit upon it maintained on proof of actual malice." The Court then proceeded to define the cases where the absolute privilege applies. "A great number of authorities" says the opinion, "have been referred to, and they have been examined with care. There is but little conflict among them in relation to the class of communications which are regarded as absolutely privileged. The classification in *Starkie on Libel and Slander*, well states the conclusion drawn from the great bulk of the cases. Those enumerated by the author as being absolutely privileged, though false and malicious, and made without reasonable or probable cause, ' are communications made in the course of judicial proceedings, whether civil or criminal, and whether by a suitor, prosecutor, witness, counsel or juror; or by a Judge, magistrate or person presiding in a judicial capacity, of any Court or other tribunal, judicial or military, recognized by and constituted according to law; and so also communications made in the course of parliamentary proceedings, whether by a member of either House of Parliament or by petition of individuals who are not members, presented to either house or to a committee thereof.' *Folkard's Starkie, sec.* 688." After thus recognizing and adopting this classification of

absolute privileges the Court adds: "Beyond this enumeration we are not prepared to go." The Court then proceeds to determine that the communication in question in that case did not belong to the class of absolute privileges, but that it fell within the rule relating to qualified privileges, and reversed the judgment and awarded a new trial, Judge MILLER dissenting. Here, then, was a case in which the absolute privilege was claimed to be applicable. The mind of the Court was distinctly called to the subject of such a privilege, to its scope and its extent. It was necessary in deciding the case to, define and clearly lay down the limits of an absolute privilege in order to determine whether the case then before the Court belonged to that class. The Court did so define and lay down those limits and did distinctly embrace within them the case of an attorney, by the adoption, with approval, of the text of Mr. Starkie. This was manifestly not an *obiter dictum*. I cannot, therefore, imagine how it is possible now to apply to the case of an attorney the qualified rule without, at the same time, holding that this Court was manifestly wrong when in *Maurice vs. Worden*, it adopted, with its sanction, the doctrine announced by Starkie that the privilege of an attorney was absolute. Judge MILLER placed his strong dissenting opinion upon the distinct ground that the communication in that case "ought to be absolutely privileged."

Holding, as I do very decidedly, these views in regard to this question, which is one of great importance, I place my assent to the affirmance of the judgment of the learned Court below, entirely upon the ground, that the words spoken by the appellee were, having been spoken in a Court of justice during a judicial investigation in which he was engaged as counsel, absolutely privileged, without any reference whatever to their relevancy.

(Filed 13th June, 1888).

STONE, J., filed the following opinion:

All the authorities, both English and American, agree in this, that what the advocate may say during the trial of a case and *which has reference to the case,* is privileged, and that he cannot be held liable, in a civil action, for what he so says. But whether his declarations made during the trial are *privileged absolutely,* whether made in reference to the case, or not, is a question upon which there is a difference of opinion.

As I am of opinion that the words complained of in this case, were clearly spoken in reference to the case then on trial, and that therefore the defendant could not be held liable even if it were conceded that a qualified privilege only should be allowed, I do not think it necessary, or advisable to determine in this case whether the privilege of the advocate is qualified or absolute.

If such decision were necessary for the determination of the case, I should concur in the opinion of Judge McSHERRY. I concur in the judgment.

(Filed 13th June, 1888).