# KENNEDY *v.* CANNON

[No. 307, September Term, 1961.]

*Decided June 13, 1962.*

The cause was argued before BRUNE, C. J., and PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*Patrick L. Rogan, Jr.* and *John B. Robbins,* with whom were *Robins & Robins* and *Richardson, Pollitt & Rogan* on the brief, for appellant.

*John W. T. Webb,* with whom were *Walter C. Anderson, W. Edgar Porter, Webb & Travers,* and *C. Awdry Thompson* on the brief, for appellee.

SYBERT, J., delivered the opinion of the Court.

This appeal questions whether the trial court erred in directing a verdict for the defendant, an attorney, in a suit for slander on the grounds that the allegedly slanderous statement was privileged as part of the defendant's duty as counsel to his client, and that no malice on the part of the defendant had been shown.

The appellee, Robert Powell Cannon (defendant below), was summoned to the Wicomico County jail in Salisbury at the request of Charles L. Humphreys, a Negro who had been arrested early that morning and charged with the rape of the appellant, Jane Linton Kennedy, a white, married woman. After conferring with the prisoner, appellee made a telephone call to Richard L. Moore, managing editor of the Salisbury Times, a daily newspaper published in Salisbury, with a circulation of about 23,000. He inquired concerning any information the newspaper might have received in regard to the charge against Humphreys and was informed by Mr. Moore that "we had talked to the authorities and had gotten a story together, and the story said that Humphreys had signed a statement admitting intercourse with the woman who was involved." Mr. Moore told the appellee that the information had been given by the State's Attorney. Thereupon, the appellee proceeded to tell Mr. Moore everything that Humphreys had related to him, including an assertion by Humphreys that Mrs. Kennedy had consented to the intercourse. When informed that it would be impossible to print matter of that type, and at such great length, appellee agreed, with some reluctance, to the publication as part of the news article of additional material quoting the appellee as to Humphreys' claim. The article which was published that afternoon included in the information furnished by the State's Attorney the identity of the appellant, the fact that she is a white woman, the fact that she had accused Humphreys, a Negro, of raping her, and a statement that Humphreys had signed an admission of the intercourse. The article then quoted appellee as having said, "He [Humphreys] emphatically denies the charge. He says that the woman submittd to his advances willingly."

As a result of the publication of the statement appellant alleged she suffered humiliation and harassment by annoying phone calls from unknown persons and eventually was forced to move with her family out of the community and the State. She instituted a suit against appellee alleging that the words spoken by him to the newspaper charged her with the crime of adultery, were slanderous *per se* under Art. 88, § 1, Code (1957), and were not privileged.

The appellee admitted on the witness stand that the newspaper article correctly quoted his statement to the editor. He sought to justify its publication on the ground that the physical safety of his client required it. He stated he feared the possibility of a lynching if only the material released by the State's Attorney were published. Recalling a lynching which had occurred in Salisbury under similar circumstances some 25 years previously, he said he felt that the account should include a denial of the charge based upon his client's claim of consent by the woman. At the conclusion of the testimony before a jury, the trial court granted appellee's motion for a directed verdict, expressing the opinion that when the State had undertaken to publish a statement about the case damaging to his client, the appellee was justified and privileged in replying as he did. Appellant appeals from the judgment for costs entered in favor of appellee.

The question raised here is whether appellee's statement comes within the ambit of Code (1957), Art. 88, § 1, *supra* (relating to slander), or whether a recovery by appellant is barred because the statement was privileged. Words of the nature involved here have been held to be slanderous *per se*. *Brinsfield v. Howeth,* 110 Md. 520, 526, 73 Atl. 289 (1909); *Cairnes v. Pelton,* 103 Md. 40, 63 Atl. 105 (1906).

The privilege afforded an attorney in a judicial proceeding and its rationale are discussed in the leading case of *Maulsby v. Reifsnider,* 69 Md. 143, 14 Atl. 505 (1888), where this Court stated (at 151):

> "* * * All agree, that counsel are privileged and protected to a certain extent, at least, for defamatory words spoken *in a judicial proceeding,* and words thus spoken are not actionable, which would in themselves be actionable, if spoken elsewhere. He is obliged in the discharge of a professional duty to prosecute and defend the most important rights and interests, the life it may be, or the liberty or the property of his client, and it is absolutely essential to the administration of justice that he should be allowed the widest latitude in commenting on the character, the conduct

and motives of parties and witnesses and other persons directly or remotely connected with the subject-matter in litigation. And to subject him to actions of slander by every one who may consider himself aggrieved, and to the costs and expenses of a harassing litigation, would be to fetter and restrain him in that open and fearless discharge of duty which he owes to his client, and which the demands of justice require. Not that the law means to say, that one, because he is counsel in the trial of a cause, has the right, abstractly considered, deliberately and maliciously to slander another, but it is the fear that if the rule were otherwise, actions without number might be brought against counsel who had not spoken falsely and maliciously. It is better therefore to make the rule of law so large that counsel acting *bona fide* in the discharge of duty, shall never be troubled, although by making it so large, others who have acted *mala fide* and maliciously, are included. The question whether words spoken by counsel were spoken maliciously or in good faith, are, and always will be, open questions, upon which opinion may differ, and counsel, however innocent, would be liable if not to judgments, to a vexatious and expensive litigation. The privilege thus recognized by law is not the privilege merely of counsel, but the privilege of clients, and the evil, if any, resulting from it must be endured for the sake of the greater good which is thereby secured. But this privilege is not an absolute and unqualified privilege, and cannot be extended beyond the reason and principles on which it is founded. * * *" (Emphasis added.)

The Court went on to hold that the words, to be privileged, must also be relevant to the judicial proceeding in which they were spoken.

The statement just quoted reflects the view of a majority of the jurisdictions in this country, although the semantics in this area of tort law have changed somewhat since the date

of the *Maulsby* case. What was characterized in that case as a qualified privilege for communications, conditioned on their being pertinent or relevant to a judicial proceeding, without regard to the motive of the speaker, is referred to by modern text writers and in case law as an absolute privilege. See, for example, *Brush-Moore Newsp. v. Pollitt,* 220 Md. 132, 137, 151 A. 2d 530 (1959); *Sanders v. Leeson Air Conditioning Corporation,* 108 N. W. 2d 761 (Mich. 1961); *Ramstead v. Morgan,* 347 P. 2d 594 (Ore. 1959); *Bailey v. McGill,* 100 S. E. 2d 860 (N. C. 1957); *Prosser, Torts* (2nd ed.), pp. 606, *et seq.;* 69 Harv. L. Rev. 875, 920. This absolute immunity extends to the judge as well as to witnesses and parties to the litigation, for defamatory statements uttered in the course of a trial or contained in pleadings, affidavits, depositions, and other documents directly related to the case. 1 *Harper & James, The Law of Torts,* § 5.22, and cases there cited. An absolute privilege is distinguished from a qualified privilege in that the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused. *Carr v. Watkins,* 227 Md. 578, 177 A. 2d 841 (1962).

Appellee in this case contends that under the *Maulsby* case, his statement was absolutely privileged. It is not disputed that the statement was relevant to the criminal proceeding. The essential question to be answered is whether it was published in—that is, as part of—a "judicial proceeding".

The term "judicial proceeding" is broad enough to cover all steps in a criminal action, so that when Humphreys was arrested and charged with rape it would be a valid conclusion that the judicial proceeding had commenced. Cf. *Commonwealth v. Dean,* 94 A. 2d 59 (Pa. 1953); *Prosser, op. cit., supra,* p. 610. However, this does not necessarily mean that every statement made by an attorney after the inception of a judicial proceeding will be privileged.

Appellee cites the oft quoted rule from 3 *Restatement, Torts,* § 586:

"An attorney at law is absolutely privileged to publish false and defamatory matter of another in

communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of a judicial proceeding in which he participates as counsel, if it has some relation thereto."

However, the extension of this absolute privilege to statements not made in the judicial proceeding itself is limited both by the comments on the rule of the *Restatement* itself, and by the decisions. The scope of the privilege is restricted to communications such as those made between an attorney and his client, or in the examination of witnesses by counsel, or in statements made by counsel to the court or jury. 3 *Restatement, Torts,* 586, comments a and c. Cf. *Washer v. Bank of America Nat. Trust & Savings Ass'n,* 136 P. 2d 297 (Calif. 1943) ; *Middlesex Concrete Products v. Carteret Ind. Ass'n,* 172 A. 2d 22 (N. J. 1961) ; *Simon v. Stim,* 176 N. Y. S. 2d 475 (1958), aff'd 199 N. Y. S. 2d 405. Appellee cites no authorities which would extend the privilege beyond a communication to one actually involved in the proceeding, either as judge, attorney, party or witness. On the other hand, it has been held that such absolute privilege will not attach to counsel's extra-judicial publications, related to the litigation, which are made outside the purview of the judicial proceeding. *West Inv. Co. v. Moorhead,* 262 P. 2d 322 (Calif. 1953) ; *Washer v. Bank of America Nat. Trust and Savings Ass'n, supra; Jacobs v. Herlands,* 17 N. Y. S. 2d 711 (1940), aff'd 19 N. Y. S. 2d 770; *Viosca v. Landfried,* 73 So. 698 (La. 1916). Nor will the attorney be privileged for actionable words spoken before persons in no way connected with the proceeding. *Robinson v. Home Fire & Marine Ins. Co.,* 49 N. W. 2d 521 (Iowa 1951). See also an early leading article by Judge Van Vechten Veeder in 9 Col. L. Rev. 463, 489.

In *Jacobs v. Herlands, supra,* an attorney, in the course of an investigation, summoned reporters, to whom he gave a statement containing alleged libel, in order to prevent the spread of "unfounded rumor". The Supreme Court of Kings County, New York, held (at 712 of 17 N. Y. S. 2d) that the "libel complained of herein was no part of the judicial pro-

ceeding, if it be assumed that the investigation was a judicial proceeding * * * and the giving out of the statement * * * was something entirely outside of the acts of the defendant in making the investigation."

In *Viosca v. Landfried, supra,* a prosecuting attorney, at the conclusion of the trial of an accused, and while the question of appeal was pending, made disparaging remarks about the defense attorney in the court building to a group of bystanders, including a newspaper reporter, and the statements were published, apparently with the prosecutor's consent. In a suit for slander and libel, the court held that the slanderous words were not spoken in the course of a judicial proceeding and the defense of privilege was not available.

All of the above cited cases make it obvious that aside from any question of ethics, an attorney who wishes to litigate his case in the press will do so at his own risk. We hold that appellee had no absolute privilege in regard to the statement made by him to the newspaper.

However, the argument is made (and the language of the trial court's opinion shows that it was persuasive there) that the forum had been chosen by the State's Attorney, and not by appellee, and that he had a right, perhaps even a duty to his client, to publish the statement in question. This argument raises indirectly the contention that because of the attorney-client relationship, at least a qualified privilege existed in the absence of a showing of malice or abuse of the privilege.

There may well be a qualified privilege based upon an attorney-client relationship which would justify an otherwise slanderous communication to certain other persons, to protect the rights of society or one to whom a legal or moral duty is owed. However, the communication *must be made in a proper manner and to proper parties only,* i. e., to parties having a corresponding interest or duty. Cf. *Henthorn v. Western Maryland Ry. Co.,* 226 Md. 499, 174 A. 2d 175 (1962); *Simon v. Robinson,* 221 Md. 200, 154 A. 2d 911 (1959); *Timmis v. Bennett,* 89 N. W. 2d 748 (Mich. 1958); 33 Am. Jur., *Libel and Slander,* § 126. It may be conceded that appellee indeed had a duty to act upon the information he had

gained as to the statement given by the State's Attorney to the newspaper, particularly in light of Humphreys' statement to him. However, the means he chose to fulfill that duty were not proper, nor did he release the communication to a party having a corresponding interest or duty in the matter; and it cannot be said that his action was within the scope of his professional acts as an attorney in a pending case. *Jacobs v. Herlands, supra.* Other steps more consonant with Canon 20, Canons of Professional Ethics, were open to appellee. He could have requested the transfer of Humphreys to the jail of another jurisdiction for safekeeping until trial. He could have sought to have the objectionable matter, contained in the proposed article, kept out of publication. Even if this attempt were unsuccessful, other tactics were possible to the attorney who eventually defended the case, e. g., a request for change of venue, *voir dire* examination of prospective jurors in regard to the article, and preservation of the question of the prejudicial effect of the article, for appellate review.

The solicitude of appellee for his client is understandable, and the initial act of the State's Attorney in releasing his statement to the press must be disapproved. Nevertheless, as we have stated, appellee's legal duty in no way justified the publication of his defamatory reply statement. To hold otherwise would open the door to the universally condemned "trial by press", a procedure forbidden to counsel and subversive of the fair and orderly conduct of judicial proceedings. For a thorough discussion of this problem see Phillips & McCoy, Conduct of Judges and Lawyers, Chap. VIII, *The Challenge of the Press.*

We hold that as a matter of law appellee had neither an absolute nor a qualified privilege in regard to the defamatory statement. Since the words spoken were slanderous *per se* they required no proof of special damage and carried the implication of malice. However, even though appellee was not reasonably entitled to believe in the existence of privilege, since none existed at law under the circumstances of this case, the trier of facts, on retrial, may consider his testimony, if reoffered, that he acted in good faith and without actual malice, on the question of mitigation of damages. As was

said in *Brush-Moore Newsp. v. Pollitt, supra* (at 139 of 220 Md.) :

> "* * * it is generally held that mitigation of damages is a partial defense to defamation, as tending to reduce both the general compensatory damages and to negative the express malice, or outrageous conduct, which is the basis for punitive damages. * * *"

See also 53 C.J.S. *Libel & Slander,* § 252.

For the reasons stated, the granting of a directed verdict for appellee was erroneous and the case should have been submitted to the jury.

*Judgment reversed and case remanded for a new trial; the costs of this appeal to be paid by appellee.*