## PETER R. ADAMS *v.* ALAN H. PECK

[No. 1350, September Term, 1978.]

*Decided July 13, 1979.*

The cause was argued before THOMPSON and WILNER, JJ., and JAMES S. GETTY, Associate Judge of the Fourth Judicial Circuit, specially assigned.

*Peter Parker* and *Harold T. Flanagan, Jr.,* for appellant.

*Charles E. Iliff, Jr.,* with whom were *John H. Mudd* and *Semmes, Bowen & Semmes* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

Peter R. Adams appeals from the summary judgment entered by the Superior Court of Baltimore City that terminated his libel action against Alan H. Peck. The question that we must decide is whether the privilege that attaches to testimony given by a witness in a judicial proceeding extends to pre-trial communications between a potential witness and counsel that relate to matters at issue in pending litigation.

It is unfortunate that the relevant facts surrounding this controversy are not set forth more directly and concisely in the record, especially as this comes to us from the granting of summary judgment. From the various pleadings, however, and particularly from the document containing the allegedly libelous statement, which was attached as an exhibit to appellant's Declaration, the facts appear to be these.

After a contentious and unhappy marriage, Dr. Adams and his wife separated on July 28, 1976; and on that day a bill and a cross-bill for divorce were filed in the Circuit Court for Baltimore County. The record does not reveal the grounds alleged in these pleadings or the extent to which collateral matters were in dispute. On August 9, 1976, they entered into a "formal" separation agreement under which Mrs. Adams was given custody of their two young children, subject to appellant's right of visitation for up to fifteen hours a week.

In early 1977, the two children — young boys aged 2½ and 4 — began to relate to Mrs. Adams bizarre and obviously disturbing tales of sexual activity and molestation suffered at the hands of their father during their visits with him. Mrs. Adams consulted the attorney representing her in the divorce proceedings, Albert S. Barr, III, who referred her to the **appellee, Dr. Peck, for a pyschiatric evaluation of the** children. On February 16, 1977, Dr. Peck interviewed Mrs. Adams and the older of the two boys. During this interview, the child described in considerable detail examples of sexual contact and activity occurring between the father and the children, at the father's insistence, that, if true, can only be described as deliberate, abusive, and grossly abnormal. From what he heard and observed, Dr. Peck concluded that the child was telling the truth; one episode in particular that the child described, Dr. Peck said, "strikes me as something which he could not make up, but probably did witness."

Accepting these stories as credible, Dr. Peck concluded:

"I would urge that he be kept away from his father on a definite basis for a considerable length of time if this story is true, and I have no reason not to believe this. His father is an ill man and in definite

need of psychiatric treatment. I have advised Mrs. Adams to keep [the child] from the father and to keep a close eye on him. I will observe him closely over the next few weeks and if I feel this has done definite and permanent harm to him, then I would feel intensive psychiatric therapy with a competent therapist would be warranted. Again I urge that all visitations with the father stop, and the father not be allowed to be around the children."

This statement was the concluding paragraph in a three-page report that Dr. Peck sent to Mr. Barr. It does not appear that he sent the report to anyone else, although it is alleged that Mr. Barr circulated it to his client, to the child's pediatrician, to appellant's attorney, to a judge of the court in which the divorce proceedings were then pending, and possibly to other court personnel.[1] Within a month after receipt of Dr. Peck's report, a petition was filed to modify appellant's visitation rights.[2] The record in this case does not reveal whether that petition has been heard, if so whether Dr. Peck appeared as a witness or whether his report was offered into evidence, or what, if any, changes were made in appellant's visitation privileges. Neither does it reveal the status of the divorce proceedings.

This proceeding was commenced on January 30, 1978 (while the divorce proceeding was still pending), when appellant sued Dr. Peck for $1,500,000 in damages for "falsely and maliciously caus[ing] to be typed or printed, and circulated and published, a certain paper writing in the form of a so-called 'Psychiatric Evaluation', which paper writing falsely and maliciously defamed the plaintiff herein." Although the entire report was attached as an exhibit to the Declaration,

---

1. This is one of the deficiencies in the record. This secondary circulation by Mr. Barr is alleged by appellant in his answers to interrogatories. The allegation has been neither admitted nor denied by Mr. Barr or anyone else; and, although it was never considered or adjudicated by the trial court, for purposes of this appeal we shall accept it as though it were true, whether or not it is.

2. Here again, this is gleaned from one of appellant's answers to interrogatories indicating that he underwent a psychiatric evaluation on March 17, 1977, "in connection with a petition for modification of visitation rights in the case of *Adams v. Adams.* . . ."

the part of it singled out for attention and quoted in the Declaration itself was the one sentence: "His father is an ill man and in definite need of psychiatric treatment." Summary judgment in favor of Dr. Peck was granted upon the sole basis that the report, even if defamatory, was absolutely privileged; and that, as noted, is the issue now before us.

The fountainhead of the Maryland law in this area is a trilogy of cases decided by the Court of Appeals on the same day — June 13, 1888. The first of these cases, *Maulsby v. Reifsnider,* 69 Md. 143, involved the extent to which words spoken by an *attorney* in the course of a judicial proceeding were privileged. There was no apparent dispute as to the existence of a privilege; the question was whether it was an absolute or a qualified one. Based upon the English precedent cited by the Court, the difference was this: if the privilege was absolute, as defined and applied in *Munster v. Lamb,* L.R. 11 Q.B.Div. 588 (1883), "no action will lie against counsel for slanderous words spoken with reference to, and in the course of, an inquiry before a judicial tribunal, although they were uttered maliciously and without any justification or even excuse, and from personal ill-will towards the person slandered." *See* 69 Md. at 154. In other words under an absolute privilege the test was merely whether the words sued on were spoken in the course of a judicial proceeding; if so, they were not actionable. Under a qualified privilege, there was a second criterion that also had to be met: not only must the words be spoken in the course of a judicial proceeding, they must, as well, have been relevant to that proceeding. *See, for example, Mackay v. Ford,* 5 Hurl. & Nor. 790, cited 69 Md. at 154.

After an extensive and learned review of these two approaches and the English cases from which they arose, a majority of the Court opted for the qualified privilege. "[W]e cannot accept", the Court said at p. 162, "the absolute and unqualified privilege laid down in *Munster v. Lamb.*" Thus, the Court went on to say, "if counsel in the trial of a cause maliciously slanders a party, or witness or any other person in regard to a matter that has no reference or relation to, or

connection with, the case before the court, he is and ought to be answerable in an action by the party injured." [3]

The second case, *Hunckel v. Voneiff,* 69 Md. 179, concerned the extent of the privilege possessed by a *witness;* and, in contrast to the view taken in *Maulsby* with respect to counsel, the Court concluded that an *absolute* privilege existed.[4] At p. 187, the Court stated quite succinctly the basis for this policy:

"The case now before us is not that of an advocate but of a witness, and in our opinion it is of the greatest importance to the administration of justice that witnesses should go upon the stand with their minds absolutely free from apprehension that they may subject themselves to an action of slander for what they may say while giving their testimony."

In reaching this conclusion, the Court squarely aligned itself with the English courts, which also had adopted an absolute privilege for witnesses, notwithstanding that the weight of American authority "is in favor of a much greater restriction upon the privilege than is sanctioned by the English decisions." 69 Md. at 193. But, continued the Court:

"[W]e are not controlled by any decision of our own courts, and are at liberty to settle the law for this State according to our best judgment. After a most careful consideration of the subject, we are convinced that the privilege of a witness should be as absolute as it has been decided to be by the English authorities we have cited, and we accordingly adopt the law on this subject as they have laid it down." *Id.* at 193.

Because what the Court in effect did was to incorporate the

---

**3.** Two judges noted in concurring Opinions their preference for the absolute privilege. As the Court held the statements in question to have been made with reference to the proceeding and thus protected even under the qualified privilege, the divergence of view was only as to the applicable law, and not as to the result in that case.

**4.** The Court dispelled, in its ruling on a motion for reargument, any notion that the distinction which it drew between counsel and witnesses was inadvertent. *See.*69 Md. at 196-99.

English law by reference, without stating the underlying principles in its own terms, it becomes important to note that the English decisions relied upon all dealt with words spoken from the witness stand. The rationale expressed for the rule by the various English authorities was essentially that witnesses appear in court under compulsion —' in obedience to the authority of the law and in discharge of a public duty — and that, in testifying, they are subject to the control of the court and to the penalty of perjury if they speak falsely. Indeed, in *Seaman v. Netherclift,* L.R.2.C.P.D. 53, quoted at some length by the Maryland Court, Chief Judge Cockburn, speaking for the English Court of Appeal, observed as a caveat to the absolute privilege:

"But I agree that if in this case beyond being spoken maliciously the words had not been spoken in the character of a witness *or not while he was giving evidence in the case,* the result might have been different. For I am very far from desiring to be considered as laying down as law that what a witness states altogether out of the character and sphere of a witness, or what he may say *dehors* the matter in hand, is necessarily protected. *I quite agree that what he says before he enters or after he has left the witness-box is not privileged,* which was the question in the case (*Trotman v. Dunn,* 4 Camp. 211,) before Lord Ellenborough." *Hunckel, supra,* at 190. (Emphasis supplied.) [5]

<hr/>

5. Trotman v. Dunn was an 1815 *nisi prius* case in which the plaintiff, a journeyman baker, had originally sued the defendant, his employer, in the Court of Conscience, to recover a week's wages. While attending that court, in that proceeding, the defendant said of the plaintiff, "He has been transported before, and ought to be transported again. He has been robbing me of nine quartern loaves a week", although it was not clear in what stage of the proceedings these words were spoken or to whom they were addressed. This produced a subsequent action by plaintiff for defamation. Lord Ellenborough opined that "[i]f it had been proved that the defendant spoke these words in opening his defence to the commissioners of the Court·of Conscience, I should immediately have directed a nonsuit. This would have been a privileged communication, and the words could not be considered as spoken maliciously in the manner and form stated in the declaration." On the other hand, said Ellenborough, "if he spoke them *ad invidiam,* and in a calumniatory manner, they are actionable, though uttered in the room where the Court of Conscience was sitting." The circumstance under which the

At issue in *Hunckel v. Voneiff* was actual testimony; and thus the question of whether words spoken or written by a witness (or potential witness) in some other context — *i.e.,* the issue presently before us — was not considered or decided by the *Hunckel* Court. Nor, except for the *nisi prius* decision in *Trotman v. Dunn* in 1815, does it appear to have been directly addressed, other than by *dicta,* in the English decisions cited by that Court. We do not, therefore, consider the Court's adoption of the English law "as they have laid it down" as necessarily adopting as well Lord Cockburn's *dicta,* much less as conclusive precedent on the particular issue now at bar.

The third case decided that day in 1888 was *Bartlett v. Christhilf,* 69 Md. 219 (1888). This involved the nature of a party-litigant's privilege. Bartlett and Christhilf, both attorneys, had been appointed receivers by the Circuit Court for Baltimore City. Christhilf subsequently filed a petition in the receivership proceeding alleging that Bartlett had wrongfully withheld assets from the receivers, had obstructed the collection of assets, had acted in contempt of the court's authority, and had embezzled receivership assets. Before a hearing was held on this petition, the receivership action was settled and dismissed. Bartlett then sued Christhilf for libel and malicious abuse of court process.

Once again, the Court of Appeals reviewed the English cases and commentators which, it concluded (p. 226):

> "... hold that statements made in any of the pleadings or proceedings in a cause before a court having jurisdiction of the subject are absolutely privileged, even though made maliciously and falsely. This privilege, protecting against a suit for libel or slander, is founded upon what would seem to be a sound public policy which looks to the free and unfettered administration of justice, though as an incidental result it may, in some instances, afford

---

words were spoken was a question of fact that the court left to the jury to decide.

With all due respect to Chief Judge Cockburn, it appears that he may have overstated somewhat the actual point at issue in Trotman v. Dunn.

an immunity to the evil disposed and malignant slanderer." *Id.* at 226.

In the particular case, the Court did not deem it necessary to determine whether a litigant's privilege was absolute or qualified — *i.e.,* whether the privilege existed only if "the thing written has relation to the subject-matter undergoing judicial investigation" (*Id.* at 226) — because the petition at issue there did in fact relate to the receivership proceeding. Thus, even though Christhilf was not actually a party in the receivership case, his petition was protected by the privilege, whether absolute or qualified. At page 227:

"To allow such suits to prevail would most effectively deter every one from presenting a well-founded complaint for fear of being pursued with 'infinite vexation.' It is better, therefore, where the statements are false and knowingly false, to leave the party injured to the redress which the Criminal Court may apply, than to open the door for the institution of civil suits which may be successfully used as an efficient means to obstruct the full and fearless pursuit and administration of justice."

The development of the law in this area since 1888 has not been especially dramatic. What the Court has done, however, is to revise some of the semantic distinctions and to view the privilege possessed by counsel, witnesses, and parties as essentially the same and therefore as applying to both evidentiary and non-evidentiary statements. These revisions were announced in *Kennedy v. Cannon,* 229 Md. 92, 96 (1962), where, after quoting at some length from *Maulsby,* the Court observed that what was described there as a qualified privilege (for attorneys),

". . . reflects the view of a majority of the jurisdictions in this country, although the semantics in this area of tort law have changed somewhat since the date of the *Maulsby* case. What was characterized in that case as a qualified privilege for communications, conditioned on their being pertinent or relevant to a

judicial proceeding, without regard to the motive of the speaker, is referred to by modern text writers and in case law as an absolute privilege. (Citations omitted.) This absolute immunity extends to the judge as well as to witnesses and parties to the litigation, for defamatory statements uttered in the course of a trial or contained in pleadings, affidavits, depositions, *and other documents directly related to the case.* (Citations omitted.) An absolute privilege is distinguished from a qualified privilege in that the former provides immunity regardless of the purpose or motive of the defendant, or the reasonableness of his conduct, while the latter is conditioned upon the absence of malice and is forfeited if it is abused." (Emphasis supplied.) *Kennedy, supra,* at 96.

*See also Di Blasio v. Kolodner,* 233 Md. 512 (1964); *Herring v. Citizens Bank & T. Co.,* 21 Md. App. 517 (1974); *Kerpelman v. Bricker,* 23 Md. App. 628 (1974).

This is the current state of the Maryland law and, as the *Kennedy* Court noted, of the law generally throughout the nation. The statement of a witness given in testimony or in pleadings, affidavits, depositions, "and other documents directly related to the case" are "absolutely" privileged. The rule is expressed this way in Restatement (Second) of Torts, § 588 (1977):

"A witness is absolutely privileged to publish defamatory matter concerning another in communications *preliminary to a proposed judicial proceeding* or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding." (Emphasis supplied.)

Comment e to this section addresses, in particular, statements made prior to the actual commencement of the judicial proceeding. It says:

"As to communications preliminary to a proposed judicial proceeding, the rule stated in this Section applies only when the communication has some

relation to a proceeding that is actually contemplated in good faith and under serious considerations by the witness or a possible party to the proceeding. The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered." [6]

Counsel have referred us to no Maryland case (and indeed have suggested that there are none) in which the privilege of a witness, which is essentially a testimonial privilege, has been held applicable to pre-trial statements made to an attorney. And, in the absence of any binding precedent, each side suggests that the case be determined on the basis of sound public policy. Naturally, they disagree on what that policy should be. Two opposing principles seem to be involved, both seeking to serve the same end: the truth-seeking function of the judicial process.

Appellant urges that the privilege be limited to statements made under oath; otherwise, he says, there would be no effective constraint upon false and scandalous statements made by witnesses and potential witnesses. The privilege becomes and remains functional, he suggests, only because, and to the extent that, there are collateral sanctions available to deter a witness from speaking falsely. To be sure, there is some measure of support for this view in *Hunckel v. Voneiff* and its English antecedents. Appellee, on the other hand, contends that denial of the privilege to pre-trial communications between potential witnesses and counsel

---

6. Not all courts have fully concurred with the point of view expressed in § 588 or in comment e; some have flatly refused to apply the privilege to communications made prior to the institution of the judicial proceeding, even where such a proceeding was under good faith contemplation and was subsequently filed. *See, for example,* Kenny v. Cleary, 363 N.Y.S.2d 606 (1975); Twelker v. Shannon & Wilson, Inc., 564 P. 2d 1131 (Wash. 1977); *also* Prosser, *Law of Torts* § 114, p. 780 (4th ed. 1971). It is not necessary in this case to adopt or reject that part of the rule or the comment. When Dr. Peck wrote the report, there was a judicial proceeding pending in which appellant's visitation privilege was a viable and important issue notwithstanding the parties' prior agreement. The report was obviously germane to that issue. Even the *Twelker* court, though refusing to apply the privilege to statements made prior to initiation of the proceeding, did not suggest that the protection of the privilege would be unavailable to statements made after the action is filed.

would invite far more serious disruptions to the proper administration of justice by inhibiting the ability of counsel (and litigants) to gather evidence and prepare their cases for trial. The hypothesis here is that the effectiveness of the truth-seeking process is dependent primarily upon adequate pre-trial preparation; and, unless potential witnesses are protected against civil liability (and the harassment of lawsuits seeking to impose such liability), they will be most reluctant to share their knowledge and opinions except under the most formal, most expensive, and least efficient circumstances.

We note initially that there is ample precedent in the law for extending the testimonial privilege to unsworn pre-trial communications between potential witnesses and counsel. More important, the precedent, though not legally binding upon this Court, rests upon sound principles of law and public policy, and for that reason will be adopted by us.

Given the proclivity of our Court of Appeals for following English decisions in this general area, perhaps the most significant case in this regard is *Watson v. M'Ewan* (1905) A C 480 (HL), decided by the House of Lords on appeal from the Court of Session, Scotland. The facts were these. In October, 1901, the plaintiff, desirous of obtaining a separation from her husband on the ground of his cruelty, consulted the defendant, a physician, with a view of acquiring his testimony as to her poor condition. The defendant did indeed examine her, and he made notes of his findings. The plaintiff subsequently instituted suit against her husband. During the course of trial, the defendant and other physicians examined the plaintiff on her *husband's* behalf.[7] The defendant reported "the results of his examination, his opinion of the case, and the nature of the evidence he was prepared to give" to the husband's agents. At the same time, he "gave information to said parties as to certain matters which he alleged he had ascertained as the result of his prior examination" of the plaintiff, and showed his notes from that examination to the husband and his attorney. Later, the

---

7. This, of course, generated a collateral issue of confidentiality which is not germane here.

defendant testified in the case, using his notes from the earlier examination. They referred to the plaintiff then being pregnant, taking "morphia", and desiring an abortion (an abortion, at the time, being a criminal act). The plaintiff then sued the defendant for slander, not because of what he said from the witness stand, but because of his pre-testimonial communication with the husband and his counsel.

Recognizing this as a case of first impression in England (and the Empire), and the arguments to be made on both sides of the question, the Earl of Halsbury, L.C., opined for the House:

> "It appears to me that the privilege which surrounds the evidence actually given in a Court of justice necessarily involves the same privilege in the case of making a statement to a solicitor and other persons who are engaged in the conduct of proceedings in Courts of justice when what is intended to be stated in a Court of justice is narrated to them — that is, to the solicitor or writer to the Signet. If it were otherwise, I think what one of the learned counsel has with great cogency pointed out would apply — that from time to time in these various efforts which have been made to make actual **witnesses responsible in the shape of an action** against them for the evidence they have given, the difficulty in the way of those who were bringing the action would have been removed at once by saying, 'I do not bring the action against you for what you said in the witness-box, but I bring the action against you for what you told the solicitor you were about to say in the witness-box.' If that could be done the object for which the privilege exists is gone, because then no witness could be called; no one would know whether what he was going to say was relevant to the question in debate between the parties. A witness would only have to say, 'I shall not tell you anything; I may have an action brought against me tomorrow if I do; therefore I shall not give you any information at all.' It is very obvious that the public

policy which renders the protection of witnesses necessary for the administration of justice must as a necessary consequence involve that which is a step towards and is part of the administration of justice — namely, the preliminary examination of witnesses to find out what they can prove. It may be that to some extent it seems to impose a hardship, but after all the hardship is not to be compared with that which would arise if it were impossible to administer justice, because people would be afraid to give their testimony." *Id.* at 487.

Having adopted the reasoning urged here by appellee, the Lord Chancellor did not ignore the concern expressed by appellant here and Mrs. M'Ewan there. His response to it was a pragmatic one. At page 488:

"The answer, of course, dealing with it as a matter of convenience and indeed of necessity for the administration of justice, I suppose, is this: unless he does give evidence in a Court of justice, in which case he can be indicted for perjury if his evidence is wilfully false, nobody knows anything about it — it slumbers, I suppose, in the office of the solicitor, and nobody hears or cares anything about it. Practically, I think that would be the answer. But whether that be a good answer or not, *what seems to me to be an overwhelming consideration in the determination of this case is that a witness must be protected for his preliminary statement or he has no protection at all,* and that there is that protection established is, as I have already said, beyond all possibility of doubt." (Emphasis supplied.)

Some American courts have reached in the same direction, though with somewhat less precision and "style" than the Earl of Halsbury. In *Zirn v. Cullom,* 63 N.Y.S.2d 439 (1946), a question was raised as to whether a letter written by an attorney to the opposing party pertaining to the possible

settlement of pending litigation was privileged. At page 440, the Court said:

> "It is not absolutely essential, in order to obtain the benefits of absolute privilege, that the language claimed to be defamatory be spoken in open court or contained in a pleading, brief, or affidavit. Thus, 'the privilege extends to statements made to a solicitor when preparing the witness's proof, and also to letters passing between a solicitor and his client, written for the purpose of giving or obtaining advice.' Odgers, Libel and Slander, 6th Ed., p. 198. 'The same privilege exists as to statements made to a party and his solicitor in preparing the proof for trial.' Newell, Slander and Libel, 4th Ed., p. 401." *Id.* at 440-41.

In an earlier case, *Moore v. Manufacturers' Nat. Bank,* 25 N. E. 1048, 1049 (1890), the New York Court of Appeals had said:

> "The general doctrine of privilege, as applied to actions for libel and slander is founded upon the reasonable view that in the intercourse between members of society, and in proceedings in legislative bodies, and in courts of justice, occasions arise when it becomes necessary or proper that the character and acts of individuals should be considered and made the subject of statement or comment, and that in the interests of society a party making disparaging statements in respect to another on such a lawful occasion should not be subjected to civil responsibility on an action of this character, although such statements might be untrue."

Essentially this approach was taken by the New Jersey court in *Middlesex Concrete Products v. Carteret Ind. Ass'n.,* 172 A. 2d 22 (N.J. Super. 1961). The plaintiff there, Middlesex, had entered into a contract with a New Jersey borough to construct a sewage treatment plant and had gotten into a dispute with the borough over various items. A lawsuit was

filed, and, during the course of it, one of the defendants, an engineering firm, wrote a report for the borough, in which it allegedly accused the plaintiff of various types of wrongdoing in the performance of the contract and urged that the borough not make further payments to the plaintiff absent a judicial determination. This produced a suit by plaintiff for tortious interference with a business relationship, to which the defense of privilege was asserted. The essence of the complaint was not what the defendant's agents had said as witnesses at trial on the contract dispute, but rather the statements contained in the pre-trial report made to the borough. This pre-trial report, said the plaintiff, "was not a step in a judicial proceeding and it afforded those harmed by it none of the protection which a judicial proceeding affords in that the report was not under oath; its author was not subject to prosecution for perjury" or subject to cross-examination. 172 A. 2d at 24. In short, essentially the same argument made by appellant here was made by the appellant there.

Rejecting that argument, however, the Court said, in relevant part:

> "The privilege or immunity is not limited to what a person may say under oath while on the witness stand. It extends to statements or communications in connection with a judicial proceeding. It protects a person while engaged in private conferences with an attorney with reference to litigation. . . .

> ". . . The investigation, report, consultations, aid and advice were pertinent and relevant to the litigation as preliminary steps in the defense of the case and a part of the preparation for the actual trial. As such, they are part of a judicial proceeding and within the privilege or immunity stated.

> "If this were not so, every expert who acts as a consultant for a client with reference to proposed or actual litigation, and thereafter appears as an expert witness, would be liable to suit at the hands of his client's adversary on the theory that while the

expert's testimony was privileged, his preliminary conferences with and reports to his client were not and could form the basis of a suit for tortious interference." *Id.* at 25.

It is clear from what the New Jersey court said that the privilege which it applied was that which pertained as well in defamation cases, and it therefore seems to us that what it said, and held, in the context of an action for tortious interference with contract, would apply equally to an action for defamation.

A similar conclusion was reached, though probably in *dicta,* in *Anderson v. Matz,* 384 N.E.2d 759 (Ill.App. 1978). The genesis of that case was an automobile accident in which a child was injured. The plaintiff, a pediatrician and encephalographer, was retained to perform an electroencephalographic examination of the child. Her report indicated abnormal brain tracings. After suit was filed by the child, the insurer retained the defendant, a neurosurgeon, to examine the child. His report, unsworn, which was sent to defense counsel in that case (and by defense counsel to the child's attorney), suggested that if the plaintiff's recommendations were her "usual" ones, they "are of no clinical value and should not in any way influence your thinking on this case." *Id.* at 760. This caused the plaintiff to sue for libel.

Although the court decided the case on another ground, it did discuss and hold applicable the defense of privilege. At page 761:

> "An absolute privilege applies to statements made in the course of judicial proceedings provided they are pertinent and material to the matter in controversy.... The matters in controversy in the suit brought by the injured child against Liberty Mutual's insured were the claimant's present physical condition and whether the headaches complained of were causally related to the head injury sustained in the accident. Defendant's report bore precisely on these issues. The contents of

defendant's report, including the allegedly libelous statements, were material, relevant and therefore, absolutely privileged." (Citations omitted.)

*See also Smith v. Hatch,* 271 C.A.2d 39 (Cal. 1969), where, in connection with an action for libel based upon an attorney's letter, the court stated at page 45:

"The absolute privilege attaches to any publication that has any reasonable relation to the action and is permitted by law if made to achieve the objects of the litigation, 'even though the publication is made outside the courtroom and no function of the court or its officers is invoked.' . . . Accordingly, 'it is not limited to the pleadings, the oral or written evidence, to publications in open court or in briefs or affidavits.' . . ." *Id.* at 45-46. (Citations omitted.)

*Also Vasquez v. Courtney,* 557 P. 2d 672 (Or. 1976), applying the privilege to a letter written by a deputy sheriff to a probation officer in connection with the latter's preparation of a pre-sentence report to the court; *Jiminez v. Maritime Overseas Corporation,* 360 F. Supp. 142, 144 (S.D.N.Y. 1973); *Gilpin v. Tack,* 256 F. Supp. 562 (W.D. Ark. 1966); 1 Harper & James, *The Law of Torts* § 5.22, p. 424 (1956) ("The witness is protected not only against liability for statements made in the witness box while under oath, but for conversations with counsel before the trial. . . ."); Annot., *Defamation — Pre-trial Procedures,* 23 A.L.R.3d 1172; *Developments in the Law of Defamation,* 69 Harv.L.Rev. 875, 923-24 (1956).

Against this growing weight of authority, we know of no instance in which an appellate court, in England or America, has withheld the privilege from pre-trial (but post-commencement) communications between a potential witness and counsel that are relevant to the pending proceeding. The reasons expressed for extension of the privilege are sound, and clearly suffice, in our judgment, to warrant the extension. As the Court of Appeals observed in *State v. Pratt,* 284 Md. 516, 520, 398 A. 2d 421, 423 (1979), "given the complexities of modern existence, few if any lawyers could, as a practical matter, represent the interest of

their clients without a variety of nonlegal assistance." Absent
the privilege, that assistance would not be as readily
forthcoming, and, indeed, may not be forthcoming at all. We,
therefore, conclude that the privilege accorded to statements
made by witnesses and counsel in the course of judicial
proceedings extends to communications made between them
prior to trial that relate in some way to pending litigation.[8]
The report prepared by Dr. Peck was clearly of that nature,
and is therefore protected by the "absolute" privilege set
forth in *Kennedy v. Cannon, supra.*

Appellant raises the secondary issue of whether, in light
of a supplemental answer filed by him to one of appellee's
interrogatories, it was proper for the court to enter summary
judgment.

On May 5, 1978, appellee filed a set of interrogatories upon
appellant. Interrogatory No. 4 asked:

"With respect to your allegation that this defendant
[*i.e.,* Dr. Peck] caused the report attached to the
declaration to have been 'circulated and published',
state:

(a) The nature, date and circumstances of each
alleged instance of circulation and/or publication.

(b) The full name and address of each person to
whom you contend that the report was circulated
and/or published, indicating as to each such person
the date of receipt of the report and the name and
address of the person from whom such report was
received."

On July 19, 1978, appellant answered some of the
interrogatories. With respect to No. 4, he said (omitting
addresses):

"The report was mailed to Albert S. Barr, III ... on
approximately February 17, 1977. The report was
then forwarded *by Mr. Barr* with the knowledge and

8. As noted earlier (footnote 6), we need not and do not address or decide
in this case whether, or under what circumstances, the privilege would
extend further to statements made in connection with contemplated litigation
not yet filed.

acquiescence of defendant, to Jacob D. Hornstein ..., various unknown personnel of the clerk's office of the Circuit Court for Baltimore County ..., Caryl W. Adams ... and The Honorable Frank E. Cicone ... all on approximately February 28, 1977. Other persons may have received said report, but their identities have not yet been ascertained by plaintiff." (Emphasis supplied.)

Two months later — on August 10 — appellant filed a supplemental answer to Interrogatory No. 4, which stated, tersely, "4(b) and 6(a) William A. Sinton, Jr., M.D., pediatrician (address omitted)". Appellee promptly excepted to this supplemental answer on the ground that it failed to state the nature, date, and circumstances of the circulation, the date the report was received by Dr. Sinton, or from whom Dr. Sinton allegedly received the report. On September 6, 1978, the exception was sustained by the court, and appellant was given 15 days to file a supplemental answer. He never complied with the court's order, and on November 14, 1978 — 10 weeks later — appellee's motion for summary judgment was granted.

Appellant now argues that because of his allegation that Dr. Sinton had also received Dr. Peck's report, there was evidence of an "extra-judicial" publication that would not be privileged. The simple answer to this is that the record before us gives absolutely no indication that this point was raised and decided in the lower court. Indeed, in light of the court's ruling on appellee's exception to the supplemental answer, the allegation, such as it is, was not properly before the court when it entered summary judgment, and could not, therefore, have been decided. We shall therefore decline to consider the point on appeal. Maryland Rule 1085.

*Judgment affirmed; appellant to pay the costs.*